## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BRENT Z.,                                      Case No. 22-CV-511 (JWB/JFD)

                        Plaintiff,

v.                                             **REPORT AND RECOMMENDATION**

KILOLO KIJAKAZI,
*Acting Commissioner of Social Security*,

                        Defendant.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Brent Z. seeks judicial review of a final decision by the Commissioner of Social Security denying his applications for disability insurance benefits (DIB) and supplemental social security income (SSI). (Soc. Sec. Admin. R. (hereinafter "R.") 25–26.)[1] Plaintiff suffered a stroke on August 15, 2018 and his resulting impairments include "fatigue, right arm and right foot weakness, right facial droop and speech impairment[,] and a neurocognitive disorder." (R. 15.) The case is currently before the Court on the parties' cross-motions for summary judgment[2] (Dkt. Nos.

---

[1] The consecutively paginated Social Security administrative record is filed at docket numbers 12 and 12-1. The Court cites to that pagination rather than to the docket number and page assigned by the Court's CM/ECF system.

[2] On December 1, 2022, the District of Minnesota amended Local Rule 7.2, which governs procedures in social security cases, to conform to the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). D. Minn. LR 7.2 advisory committee's note to 2022 amendment. The Supplemental Rules apply to actions filed on or after December 1, 2022. *Id.* (Dkt. No. 19.) Because Plaintiff filed this case before December 1, 2022, the procedures established by the previous version of Local Rule 7.2 apply, including a provision that the Court resolve the case on cross-motions for summary judgment. (Dkt. No. 19.) *See* D. Minn. LR 7.2(c) (2015).

14, 16), which were referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1(a)(3)(D). For the reasons set forth below, the Court recommends that this matter be remanded to the Social Security Administration ("SSA") to correct an error of law.

## I.    Background

Plaintiff suffered a stroke (R. 381) that forced him to leave his job as a home remodeler (R. 38, 259). After he moved to Minnesota to be near family, he applied for DIB and SSI. (R. 38, 259.) He now appeals the Commissioner's decision denying him these benefits. (Compl. 1.)

### A. Relevant Medical History

On August 15, 2018, Plaintiff presented to a Kansas emergency room with an altered mental state, right facial droop, and slurred speech. (R. 381.) A CT scan revealed that he had had a stroke. (R. 381.) Plaintiff had a history of untreated hypertension, acute kidney injury, alcoholism, and smoking. (R. 382–83.) According to his family, Plaintiff moved to Minnesota "for a short time" so that his family could care for him, but he eventually returned to Kansas to continue his job with a remodeling firm, where he had worked for 21 years. (R. 259, 662.) Plaintiff did not have health insurance and his family reported that he did not have access to physical therapy in Kansas. (R. 259, 662.) Despite the work modifications that the owner of the remodeling firm gave Plaintiff, Plaintiff could not continue working. (R. 38, 44–45, 259,662, 666.) The owner contacted Plaintiff's family and helped arrange for his return to Minnesota. (R. 259.) Plaintiff started receiving medical

care, including occupational and physical therapy, in Minnesota in November 2018. (R. 545–47; 574–76; 661.)

Plaintiff has had other notable health developments. In February 2020, doctors discovered that Plaintiff had a kidney stone (R. 722) and decreased kidney function, possibly due to overtreatment of his hypertension (R. 725–28, 734). Plaintiff was diagnosed with stage three chronic kidney disease. (R. 787, 863.) Surgeons removed Plaintiff's kidney stone in March 2020. (R. 802–03.)

## B. Administrative Proceedings

On November 15, 2018, Plaintiff applied for DIB under Title II of the Social Security Act. (R. 74.) On November 27, 2018, Plaintiff applied for SSI under Title XVI of the Act. (R. 58.) In both applications, Plaintiff alleged that he was disabled and unable to work as of November 2, 2018. (R. 58, 74.) Plaintiff was last insured for DIB purposes on December 31, 2022.[3] (R. 57, 93, 99, 281, 325, 365.) A DIB claimant must establish that they were disabled before their insured status expires. *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998). Thus, the relevant period for Plaintiff's DIB claim is from November 2,

---

[3] DIB is a social insurance program, limited to nonelderly, disabled people who have paid sufficient social security taxes (by working and having social security taxes withheld from their pay) to be covered under the program as soon as they become disabled. William R. Morton, Cong. Rsch. Serv., R44948, *Social Security Disability Insurance and Supplemental Security Income: Eligibility, Benefits, and Financing* 1 (2018). The number of quarters that a person has paid into the program determines their "date last insured." *See Wallace v. Astrue*, No. 10-CV-342 (JRT/FLN), 2011 WL 2014884, at *1 n.2 (D. Minn. May 23, 2011). SSI, by contrast, is a need-based public assistance program. Morton, at 14. A claimant can apply for both DIB and SSI. *Id.* at 34.
The Court assumes that the ALJ's statement that the last insured date is December 31, 2023 was a typographical error because it conflicts with the other sources in the record cited above. (*See* R. 13, 15.) The date last insured is December 31, 2022.

2018 (the alleged disability onset date) to December 31, 2022 (his date last insured). SSI benefits are not payable before an application is filed, 20 C.F.R. § 416.335, and thus, the relevant time frame for Plaintiff's SSI claim is from November 27, 2018 (the date of the SSI application) to May 5, 2021 (the date of the ALJ's decision). *See Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989) (using SSI application date to mark the beginning of the relevant time period); *Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013) (using the date of the ALJ's decision on the SSI claim to mark the end of the relevant time period).

In his applications, Plaintiff reported that the weakness and poor grip in his right arm, dragging right foot, fatigue and associated aphasia, memory challenges, slurred speech, and slower cognitive recall prevented him from working. (R. 58, 284.) The SSA ordered a consultative examination after concluding that there was not sufficient evidence in the medical record to evaluate Plaintiff's claimed memory challenges. (R. 62, 661.) The examiner, Lyle W. Wagner, Ph.D., summarized his findings in a medical source statement. (R. 666.) Dr. Wagner found that Plaintiff had a verbal IQ in the "Low Average" range, meaning "he is capable of understanding simple instructions," but would "have Moderate to Severe difficulty remembering and following" them. (*Id.*) Dr. Wagner found that Plaintiff would have "Moderate to Severe" difficulty with "sustaining attention and concentration" and with "carrying out work-like tasks with reasonable persistence and pace." (*Id.*) Dr. Wagner found that Plaintiff's cognitive challenges would give him "Mild to Moderate difficulty" engaging with others and "Moderate to Severe difficulty" in handling the stress of an entry level job. (*Id.*)

4

The SSA denied Plaintiff's initial claims for both DIB and SSI (R. 71, 87, 128, 129, 131, 132) and affirmed those denials on reconsideration (R. 108, 125, 143, 147). Plaintiff appealed to an ALJ (R. 150), who held a hearing (R. 32–56). At the start of the hearing, the ALJ asked counsel for Plaintiff if he considered the record complete, and counsel agreed that it was complete, making no objections to any exhibits in the ALJ's file. (R. 36.) Plaintiff testified under oath about his attempt to return to work after his stroke. (R. 38, 44–45.) He reported that he did not look for other work. (R. 38.) Plaintiff testified that the main impairment that prevented him from working was weakness in his right arm and leg. (R. 39.) He reported that he could only walk about 25 minutes before needing to take a 15-to-20-minute break[4] (R. 40), that he needed to nap during the day (R. 41), and that he had difficulty speaking when he was tired (R. 43). Plaintiff also explained that he had poor short-term memory and that he needed to be reminded of something every day. (R. 43.) He further testified that he could not complete an unfamiliar task, and that he needed to stop and "rethink" familiar tasks before he could finish them. (R. 47.) Plaintiff reported limited vision in his left eye. (R. 46.) Finally, Plaintiff testified that his condition had not changed substantially since 2019. (R. 47.)

The ALJ then questioned the vocational expert, Mr. William Tisdale. (R. 50.) The ALJ provided Mr. Tisdale with the following hypothetical on which to base his testimony:

> [P]lease assume an individual of Claimant's closely approaching advanced age, high school education and past work as you have described who has the residual functional capacity to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally; who can sit about 6 hours in an 8-hour day with

---

[4] Later in the hearing Plaintiff claimed he could only walk four to five minutes before resting for 15 to 20 minutes. (R. 42.)

normal breaks; can stand and/or walk about 6 hours in an 8-hour day with
normal breaks. Should never climb ladders, ropes or scaffolds; only
occasionally climb stairs or ramps; balance as defined in the [Selected
Characteristics of Occupations]; push and pull with the right upper extremity,
stoop, kneel, crouch or crawl. The individual can frequently handle, finger
and feel with the right dominant upper extremity. Can tolerate only
occasional exposure to work around hazards such as dangerous moving
machinery and unprotected heights. The individual is able to understand,
remember and carry out short/simple instructions; able to maintain attention
and concentration for routine work for two-hour segments; able to respond
appropriately to work pressures in a usual work setting and be able to respond
appropriately to changes in a routine work setting.

(R. 51–52.) Mr. Tisdale opined that such a person could not do the kind of work Plaintiff

had done before his stroke but testified that there was other work that such a person could

do, including that of a survey worker, merchandise marker, or routing clerk. (R. 52.) After

hearing the testimony and reviewing the record, the ALJ concluded that Plaintiff was not

disabled under the Social Security Act (R. 25). The ALJ summarized her findings in a

written decision. (R. 13–26.)

The ALJ's decision followed the five-step sequential analysis for social security

disability determinations described in 20 C.F.R. §§ 404.1520 and 416.920. At each step,

the ALJ considered whether Plaintiff was disabled based on the criteria of that step. If he

was not, the ALJ proceeded to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4) and

416.920(a)(4).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity[5] after his alleged disability onset date of November 2, 2018. (R. 15.) Since the ALJ

---

[5] The SSA uses "substantial gainful activity" as a synonym for working for compensation.
*See* 20 C.F.R. §§ 404.1572, 416.972. If a claimant can engage in "substantial gainful

found that Plaintiff was not involved in substantial gainful activity, the ALJ proceeded to step two of the analysis.

At step two, the ALJ found that Plaintiff had multiple severe impairments: a "stroke resulting in fatigue, right arm and right foot weakness, right facial droop and speech impairment[,] and a neurocognitive disorder." (R. 15.) The ALJ found Plaintiff's acute kidney injury to not be severe[6] because it was not a condition lasting twelve months and concluded that Plaintiff's chronic kidney disease has "not resulted in any specific functional limitations and is merely monitored." (R. 16.) Plaintiff's history of alcoholism and hypertension were also not severe in the ALJ's view. (R. 16–17.) The ALJ further noted that Plaintiff's testimony about vision problems in his left eye was inconsistent with the record, where Plaintiff had "frequently denied vision problems to treatment providers." (R. 17.)

Moving to step three, the ALJ consulted the listing of impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). The ALJ concluded that Plaintiff did not have a condition that met or medically equaled the severity

---

activity" after their claimed onset of disability date, the SSA will find them not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i).

[6] The SSA considers an impairment not severe if "it does not significantly limit [a claimant's] ability to do basic work activities," such as walking, standing, seeing, hearing, speaking, remembering, using judgment, and responding appropriately to the work environment. 20 C.F.R. §§ 404.1520(c), 404.1522, 416.920(c), 416.922. In contrast, a severe impairment must significantly limit a claimant's ability to do these activities, and the impairment must last at minimum 12 months. 20 C.F.R. §§ 404.1522, 416.922, 404.1509, 416.909.

of the listed conditions. (R. 17.) The ALJ specifically consulted Listing 12.02 for neurocognitive disorders and found that the Plaintiff's condition did not meet or medically equal the severity of the condition described in the listings. (*Id.*); *see* 20 C.F.R. pt. 404, subpart P, app. 1, § 12.02. In coming to this conclusion, the ALJ considered the four "paragraph B" functional areas that ALJs evaluate when they assess a claim that a claimant is disabled due to a mental health impairment. 20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3) (explaining the four functional areas as "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself"). The ALJ found that Plaintiff had a moderate[7] limitation in the first, third, and fourth functional areas, and a mild limitation in the second functional area. (R. 17–18.) Thus, the ALJ concluded that Plaintiff's mental condition did not meet or medically equal a condition in the listings. (R. 19.)

Finding that the record did not show Plaintiff met the criteria in the listing, the ALJ proceeded to determine Plaintiff's residual functional capacity[8] ("RFC") before proceeding to step four. (R. 19.); 20 C.F.R. §§ 404.1520(e) and 416.920(e). The ALJ made the following findings:

> [C]laimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). He is

---

[7] ALJs classify impairment in a functional area on a five-point scale: None, mild, moderate, marked, and extreme. 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00(F)(2). For a mental impairment to be considered severe under the "paragraph B" criteria, it must cause an extreme limitation in at least one functional area, or a marked limitation in at least two functional areas. *Id.* at § 12.00(A)(2)(b).

[8] RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

able to lift and/or carry up to ten pounds frequently and twenty pounds occasionally. The claimant can sit for about six hours in an eight-hour workday with normal breaks. He can stand and/or walk for six hours in an eight-hour workday with normal breaks. The claimant should never climb ladders, ropes and scaffolds, but only occasionally climb ramps and stairs, balance as defined in the Selected Characteristics of Occupations, push and pull with the right upper extremity, stoop, kneel, crouch or crawl. He can frequently handle, finger and feel with the right dominant upper extremity. The claimant can tolerate only occasional exposure to work around hazards such as dangerous moving machinery and unprotected heights. He is able to understand, remember and carry out short, simple instructions. The claimant is able to maintain attention and concentration for routine work for two-hour segments. He is able to respond appropriately to work pressures in a usual work setting. The claimant is able to respond appropriately to changes in a routine work setting.

(R. 19.) In determining Plaintiff's residual functional capacity, the ALJ found that Plaintiff's medically determinable impairments could reasonably cause his symptoms but that his statements about the "intensity, persistence, and limiting effects of these symptoms" were not "entirely consistent" with the evidence in the record. (R. 21.) The ALJ noted that Plaintiff's right arm strength improved and his pain decreased during physical therapy and that he had a limited treatment history for his arm weakness after January 2019. (R. 21.) She acknowledged Plaintiff's complaints of weakness and numbness in his right arm in February 2020 but noted that an examination found that he had "full five out of five muscle strength" and that there was no evidence of any follow up treatment. (*Id.*) In the ALJ's view, the psychological evaluation suggested that Plaintiff could do simple work and his activities of daily living suggested that he could do some light work. (R. 22.)

The ALJ considered the assessments of the state agency consultants[9] to be "somewhat persuasive." (R. 23.) As for the opinions of the state medical consultants who suggested limitations for Plaintiff's right arm movement, the ALJ noted again that Plaintiff had not received treatment for his right arm since January 2019 and that Plaintiff's strength was good at that time. (R. 23.) As for the opinions of the state psychological consultants who suggested that Plaintiff could "understand, remember and carry out and sustain performance of one to two step tasks, but would become overwhelmed if the procedure were more complicated," the ALJ found these opinions "generally persuasive." (*Id.*) However, the ALJ noted that there was "no support" in the record for social limitations because nothing suggested that Plaintiff had difficulties in getting along with others. (*Id.*)

The ALJ considered the opinion of Dr. Wagner, the consultative examiner, to be "somewhat persuasive." (*Id.*) The ALJ noted that the opinion did not list "specific functional limitations in some of the areas addressed and the claimant doesn't really report any difficulty with social interactions." (*Id.*) In fact, the ALJ said, Plaintiff reported spending time with others, such as at a bar or restaurant, before the COVID-19 pandemic. (*Id.*) Dr. Whiteman, one of Plaintiff's treating physicians, reviewed and concurred with Dr.

---

[9] The Social Security Act requires state, not federal, agencies to initially evaluate a claimant's eligibility for social security benefits. 42 U.S.C. § 421(a)(1); *see also* 20 C.F.R. §§ 404.1503, 404.1613, and 404.1615 (explaining the division of labor between the states and the SSA); Morton, at 39–40 (explaining the initial determination process). Minnesota Disability Determination Services, an agency within the Minnesota Department of Employment and Economic Development, uses SSA guidelines to evaluate social security claims arising in Minnesota. *Disability Determination Services*, MN Employment and Economic Development, https://mn.gov/deed/programs-services/dds/ (last visited Jan. 23, 2023).

Wagner's opinion at the request of Plaintiff's counsel, and the ALJ found this concurrence "somewhat persuasive" for the same reasons she found Dr. Wagner's opinion to be so. (R. 24.) She noted, however, that Dr. Whiteman had neither evaluated nor treated Plaintiff's mental condition. (*Id.*)

At step four, the ALJ found that Plaintiff could not continue his previous work given his new RFC. (R. 24); 20 C.F.R. §§ 404.1520(f) and 416.920(f). In coming to this conclusion, the ALJ considered the opinion of Mr. Tisdale, the vocational expert. (R. 25.) At the fifth and final step, the ALJ found that Plaintiff was not disabled based on Mr. Tisdale's testimony that there were jobs in the national economy that could accommodate a person of his age, education, work experience, and RFC. (*Id.*) 20 C.F.R. §§ 404.1520(g) and 416.920(g). Plaintiff appealed the ALJ's ruling to the SSA's Appeals Council, arguing that "[t]he determination [was] not consistent with the facts and the law." (R. 155, 233.) He argued that he was "unable to engage in substantial gainful activity due to disability," (R. 155, 233) but the Appeals Council denied his request for review (R. 1). After the denial, the ALJ's decision became the final decision of the Commissioner. *Sims v. Apfel*, 530 U.S. 103, 106 (2000); *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

## C. Judicial Review

Plaintiff filed a complaint in United States District Court and the Commissioner filed her answer and the administrative record. (Compl., Dkt. No. 1; Answer, Dkt. No. 11; Admin. R., Dkt. Nos. 12, 12-1.) The case is before this Court on the parties' cross-motions for summary judgment, which are fully briefed and ripe for decision (*See* Dkt. Nos. 15, 17, 18.)

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited. The district court "reverses the findings of the Commissioner only if they are unsupported by substantial evidence or result from an error of law." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden of proving disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB and SSI, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The disability, not just the

impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III.    Analysis

Plaintiff makes five claims of error, which the Court analyzes in turn.

### A. The ALJ Did Not Err in Explaining the Persuasiveness of Dr. Wagner and Dr. Whiteman's Opinions.

Plaintiff claims that the ALJ erred by not explaining why she concluded Dr. Wagner and Dr. Whiteman's opinions were "generally persuasive." (Pl.'s Mem. Supp. Summ. J. 3, 22.) Specifically, Plaintiff argues that the ALJ failed to explain why she discounted the opinions about Plaintiff's ability to handle stress. (*Id.* at 22.) The Commissioner argues that the ALJ assessed Dr. Wagner's opinion (which Dr. Whiteman cosigned) and found that it lacked supportability, specificity, and consistency. (Def.'s Mem. Supp. Summ. J. 20–22.)

Title 20 C.F.R. § 404.1520c sets forth the current standards for an ALJ to review medical opinion evidence and prior administrative medical findings.[10] The regulation became effective on March 27, 2017 for claims filed on or after that date, taking the place of previous regulations set forth in 20 C.F.R. § 404.1527. Before the new regulation, opinions from medical sources who had a longstanding treatment relationship with the claimant could be deemed "controlling" evidence. *See* 20 C.F.R. § 404.1527(c)(2). In

---

[10] A prior administrative medical finding is a finding about a medical issue made by a medical consultant or psychological consultant at a prior administrative level. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017).

addition, medical opinion evidence was "weighed" and given more or less "weight" depending on several factors. *Id.* § 404.1527(c).

For claims filed on or after March 27, 2017, such as Plaintiff's, medical opinion evidence and prior administrative medical findings are no longer analyzed in the language of "weight." 20 C.F.R. § 404.1520c(a). Rather, medical opinions and prior administrative medical findings are evaluated for their "persuasiveness" according to five factors: supportability, consistency, relationship with the claimant, specialization, and any other relevant factors. 20 C.F.R. § 404.1520c(c)(1)–(5). The most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). Medical opinion evidence and prior administrative medical findings are treated equally under § 404.1520c.

An ALJ may accept the entirety of a medical opinion, but is also "free to accept some, but not all, of a medical opinion." *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022) (citing *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016)). It would be impossible for ALJs to evaluate each of the statements and claims within a medical opinion. 20 C.F.R. § 404.1520c(b)(1). The ALJ must, however, explain whether the medical opinion is supported and consistent with the evidence as a whole. 20 C.F.R. § 404.1520c(b)(2).

The ALJ in this case did, in fact, elaborate on why she discounted Dr. Wagner's belief that Plaintiff would have "moderate to severe difficulty tolerating the stress and pressure typically found in entry-level employment" as a review of the entire page of the ALJ's analysis shows. (*See* R. 23.) First, the ALJ found that the state psychological consultants' opinions were "generally persuasive, as they are consistent with the scores the

claimant received on the WAIS-IV[11] and WMS-IV[12] testing, but there is no support for social limitations as the claimant has not reported any significant difficulties getting along with others in either his reports, testimony or statements to medical providers." (*Id.*) Then, the ALJ came to a similar conclusion about Dr. Wagner's opinion:

> Finally, Dr. Wagner opined that the claimant would have moderate to severe difficulty tolerating the stress and pressure typically found in entry-level employment. This opinion, overall, is somewhat persuasive, as the scores from the WAIS-IV and WMS-IV testing support the neurocognitive disorder diagnosis and some restrictions to his ability to perform more than simple instructions and work activity, but it doesn't set forth specific functional limitations in some of the areas addressed and the claimant doesn't really report any difficulty with social interactions. In fact, he has related that he spends time with others, goes to the bar and restaurant before the pandemic, though he no longer plays pool or throws darts[.]

*Id.*

The ALJ found that Dr. Wagner's opinion lacked support for his conclusion that Plaintiff was limited in his ability to handle stress and was inconsistent with the Plaintiff's own self reporting.[13] She further found that Dr. Wagner's opinion was not specific because it did not translate Plaintiff's supposed challenges to a discrete functional limitation. The ALJ found Dr. Whiteman's opinion "somewhat persuasive" for the same reasons. (R. 24.) Because the ALJ addressed both consistency and supportability in her assessment, she sufficiently explained her reasoning in her written decision.

---

[11] Wechsler Adult Intelligence Scale. (R. 17.)

[12] Wechsler Memory Scale. (R. 17.)

[13] The Court notes that Plaintiff himself opined that he believes he handles stress and changes to his routine "O.K." (R. 315.)

**B. The ALJ Erred in Not Explaining Why She Decided to Not Include a "One to Two Step" Limitation in the RFC.**

Plaintiff argues that the ALJ erred by not including a "one to two step tasks limitation" in the RFC, given that she found "generally persuasive" the opinions of psychological consultants who suggested such a limitation. (Pl.'s Mem. Supp. Summ. J. 2.) Plaintiff argues that this was a fundamental flaw in the ALJ's analysis which harmed the Plaintiff because a person who can only handle one to two step tasks cannot do a job at reasoning level two[14] or higher, which is the reasoning level required for the jobs that the ALJ concluded Plaintiff could hold.[15] (Pl.'s Mem. Supp. Summ. J. 17–18.); *see also Thomas v. Berryhill*, 881 F.3d 672, 678 (8th Cir. 2018) ("By incorporating the definition of level-one reasoning into the RFC, the ALJ indicated 'that [Thomas] could perform only occupations at [that] reasoning level.'"); *Stanton v. Comm'r Soc. Sec. Admin.*, 899 F.3d 555, 5590 (8th Cir. 2018) ("The ALJ here did limit job instructions to one- to two-step instructions, and she thereby indicated that Stanton could perform only occupations

---

[14] The DOT, which the SSA uses to determine what skills a person must have to fulfill a particular role, recognizes six levels of reasoning development. 2 *Dictionary of Occupational Titles*, app. C (4th ed. 1991), 1991 WL 688702. The first level requires a claimant to "[a]pply a commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.*

[15] Mr. Tisdale testified that Plaintiff could be a survey worker, merchandise marker, or routing clerk. (R. 52.) Survey workers use a reasoning level of three. 205.367-054 Survey Worker, *Dictionary of Occupational Titles*, (4th ed. 1991), 1991 WL 671725. Merchandise markers and routing clerks use a reasoning level of two. 209.587-034 Marker, *Dictionary of Occupational Titles*, (4th ed. 1991), 1991 WL 671802; 222.587-038 Router, *Dictionary of Occupational Titles*, (4th ed. 1991), 1991 WL 672123.

requiring Level 1 Reasoning."). The Commissioner responds that while the ALJ found the opinions "generally persuasive, she did not say she was entirely adopting them." (Def.'s Mem. Supp. Summ. J. 25.) The Commissioner argues that the ALJ included in her hypothetical and RFC those portions of the opinions which were supported and consistent with the evidence. (*Id.* at 26.)

This Court addressed a similar dispute in *Mark S. E. v. Kijakazi.* No. 20-CV-1954 (JFD), 2022 WL 834513, at *3–5 (D. Minn. Mar. 21, 2022). In *Mark S. E.* the plaintiff claimed that the ALJ erred by failing to explain why she did not include the one to two step task limitation articulated by two consulting psychologists in his RFC, when the ALJ found the psychologists' opinion to be consistent with the medical evidence and the record. *Id.* at *2–3. As here, the ALJ in *Mark S. E.* "explicitly recited the limitation that Plaintiff could sustain simple, one-to-two step tasks," then found the opinion of the psychologists to be consistent with the medical record but did "not specifically include a one-to-two step task limitation" in the RFC. *Id.* at *3. The Court found that the now-defunct assignment of "great" or "significant" weight previously given to medical opinions and prior administrative medical findings, *see* 20 C.F.R. § 404.1527, was sufficiently similar to the current "persuasive" designation, *see* 20 C.F.R. § 404.1520c, such that the ALJ should include in the RFC the limitations contained in an opinion they deemed persuasive or explain why they did not do so. *Id.* at *4 (citing *Michelle L. D. v. Saul*, No. 19-CV-2054 (KEM), 2020 WL 6470180, at *7 (N.D. Iowa Nov. 3, 2020)); *see also Gann v. Berryhill*, 864 F.3d 947, 952–53 (8th Cir. 2017) (decided under previous regulations). Otherwise, it would be "unclear whether the ALJ believed his RFC determination captured this

17

limitation, or whether the ALJ found this limitation unsupported or inconsistent with the record." *Mark S. E.*, 2022 WL 834513, at *4 (quoting *Michelle L. D.*, 2022 WL 834513, at *7). The Court also found that "the purpose of § 404.1520c could be undermined if an ALJ did not adopt the limitations contained in an opinion that the ALJ found persuasive, consistent, and well-supported." *Id.* at *5 (agreeing with *Michelle L. D.*).

Here, the state psychological examiner found that Plaintiff "retains the capacity to understand, remember, carry out and sustain performance of one to two step tasks (but would become overwhelmed if the procedures were more complicated)." (R. 64–65, 69.) On reconsideration by a different officer at the state agency, the SSA found this conclusion "consistent with and supported by the evidence of record and persuasive." (R. 122–23.) *See* Morton, at 48–49 (explaining the reconsideration process). The ALJ acknowledged this finding in her decision and found it to be "generally persuasive" as to the limits it prescribed. (R. 23 ("[T]he assessments of the State agency medical and psychological consultants are somewhat persuasive . . . .The State agency psychological consultants had opined that the claimant retained the capacity to . . . carry out . . . one to two step tasks . . . .").) Dr. Wagner, a consultative examiner whose opinion the ALJ found to be "somewhat persuasive," opined that Plaintiff was "capable of understanding simple instructions." (R. 666.) When the ALJ assessed Plaintiff's RFC, she did not limit Plaintiff to one to two step tasks, but instead said that he could "understand, remember and carry out short, simple instructions." (R. 19.) The ALJ did not explain why she found the one to two step limitation unsupported or inconsistent with the record, or why she found Dr. Wagner's limitation to "simple instructions" supported or consistent with the record. Thus, the Court cannot

determine whether the ALJ intended to include or exclude a one to two step limitation on this record. Accordingly, the Court concludes that the ALJ should have either included the one to two step limitation in the RFC or explained the decision to omit it, finds the failure to do so to be an error of law, and recommends remand to address this error. *See Mark S. E.*, 2022 WL 834513, at *5 ("On remand, the ALJ must either include the one-to-two step task limitation in the RFC or explain why she did not do so.")

### C. The ALJ Did Not Err Under SSR 00-4p.

Plaintiff next alleges that the ALJ erred by failing to notice and correct an inconsistency between the Dictionary of Occupational Titles ("DOT") jobs that she found Plaintiff could do (which were listed at reasoning level 2 and 3)[16] based on the vocational expert's testimony, and the hypothetical the ALJ put to the vocational expert stating that Plaintiff was limited to following "short, simple instructions." (Pl.'s Mem. Supp. Summ. J. 3.) Plaintiff argues there is an inconsistency between the evidence provided by the vocational expert (namely, what jobs Plaintiff could do given his RFC) and the DOT (the reasoning level required to do those jobs). *Id.* If an inconsistency exists between the

---

[16] The DOT defines reasoning levels two and three as follows:

> Level two: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
> Level three: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

2 *Dictionary of Occupational Titles*, app. C (4th ed. 1991), 1991 WL 688702.

vocational expert's testimony and the DOT, the ALJ must explain how they resolved the apparent inconsistency. *See* SSR 00-4P, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000). Without such an explanation, a court cannot properly rely on the examiner's testimony. *See Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014) (finding ALJ's failure to address and correct such an inconsistency meant the Commissioner failed to meet her burden to show there were jobs in the national economy that the plaintiff could do). The Commissioner maintains that there is no inconsistency between Mr. Tisdale's testimony and the DOT; a limitation to "simple instructions" does not preclude a person from doing a job listed at reasoning level two.

The Commissioner is correct. The Eighth Circuit does not consider "simple job instructions" to mean only "one- or two-step instructions." *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010). While courts in the Eighth Circuit have differed on whether "simple" and "routine" work are consistent with a reasoning level of three, *Erik D. v. Kijakazi*, No. 20-CV-19 (KEM), 2022 WL 965396, at *7 (N.D. Iowa Mar. 30, 2022), a reasoning level of two "is generally found to be consistent" with understanding "simple" instructions and performing "simple" tasks. *Nicholas J. v. Kijakazi*, No. 20-CV-1340 (WMW/ECW), 2022 WL 1109810, at *25 (D. Minn. Jan. 20, 2022).

Here, the vocational expert testified about two jobs at reasoning level two that Plaintiff could do which, when combined, represent over 100,000 jobs nationally. (R. 25). Such testimony from the vocational expert is substantial evidence that there are jobs in the national economy that Plaintiff can do. *See Nicholas J.*, 2022 WL 1109810, at *25 (finding 20,500 jobs nationally to be a significant number).

Plaintiff relies on *Stanton v. Commissioner, Social Security Administration*, and *Thomas v. Berryhill*, but in those cases the ALJ incorporated a one to two step limitation in the RFC, where the ALJ here did not. *Stanton*, 899 F.3d at 555; *Thomas v. Berryhill¸* 881 F.3d 672, 678 (8th Cir. 2018) ("By incorporating the definition of level-one reasoning into the RFC, the ALJ indicated 'that [Thomas] could perform only occupations at [that] reasoning level.'" (quoting *Moore*, 623 F.3d at 604)). The fact that the ALJ here did not incorporate this limitation is the very subject of the Plaintiff's previous argument, which this Court has already found persuasive.

### D. The ALJ Fully and Fairly Developed the Record Regarding Plaintiff's Physical Limitations and Did Not Need to Order a Consultative Neurological Examination.

Plaintiff claims that the ALJ erred by not ordering a consultative examination to determine his physical and cognitive limitations after January 2019, when he stopped occupational and physical therapy because he could not pay for them. (Pl.'s Mem. Supp. Summ. J. 24–25.) Plaintiff argues that the ALJ should have ordered a consultative examination with a neurologist, since both of the state agency reviewers were internists. (*Id.* at 25; R. 88, 125) *See* Soc. Sec. Admin. Programs Operations Manual Sys. DI 24501.004 (listing codes that identify a medical specialty, with 19 being internal medicine). The Commissioner argues that an ALJ need not order a consultative examination if they can make an informed decision on the record before them, and that no additional information was needed in this case. (Def.'s Mem. Supp. Summ. J. 28.)

An additional consultative examination was not required in this case. An ALJ need not request a consultative examination when she has sufficient information to make an

21

informed decision. *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). The ALJ in this case based her decision on Plaintiff's medical records (R. 15–17, 21–22), Plaintiff's testimony at the hearing (R. 17, 18, 20–21, 22–23), the vocational expert's testimony at the same hearing (R. 25), a function report completed by Plaintiff's brother (18, 22), assessments from the state agency medical and psychological consultants (R. 23), and a consultative psychological evaluation (R. 17, 22, 23), among other sources. This was ample information for the ALJ to come to an informed decision about whether Plaintiff was disabled. *See Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001) (finding no additional consultative examination needed because substantial evidence in the record allowed ALJ to reach an informed decision, including reports from physicians, consultants, psychologists, as well as test results, disability reports, questionnaires, and hearing transcripts).

The fact that Plaintiff did not raise this supposed lack of evidence earlier suggests that any additional evidence would have been minimally useful. *See Shannon v. Chater,* 54 F.3d 484, 488 (8th Cir. 1995) ("Although the ALJ has a duty to develop the record despite the claimant's representation by counsel, the fact that Shannon's counsel did not obtain (or, so far as we know, try to obtain) the items Shannon now complains of suggests that these alleged treatments have only minor importance."). When Plaintiff sought reconsideration of the state agency's unfavorable determination in May 2019, he said there was no change in his physical or mental condition since his last application and that he had not acquired any new conditions. (R. 94, 99, 111, 116, 140.)  When Plaintiff appeared before the ALJ in April 2021, Plaintiff's counsel represented that the record was complete, and Plaintiff

testified that his condition had not changed substantially since 2019. (R. 36, 47.) The Court does not find evidence to suggest that the ALJ should have ordered another consultative examination in this case. Further, a failure to order a consultative examination is reversible error only when the failure prejudices the claimant, *Shannon v. Chater,* 54 F.3d at 488, and Plaintiff has not explained how a consultative examination by a neurologist would help his case, besides providing updated examination data. (*See* Pl.'s Mem. Supp. Summ. J. 24–25.)

### E.  ALJ Larsen Was Constitutionally Appointed.

Plaintiff claims that the ALJ who considered his case was not properly appointed under the Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. §§ 3345–3349d, because the acting commissioner who ratified the ALJ's appointment was herself improperly serving as acting commissioner at the time she ratified the appointment. (Pl.'s Mem. Supp. Summ. J. 3.) When an executive branch employee appointed by the President with the advice and consent of the Senate resigns, the FVRA contemplates two possible periods of time when another person may temporarily take on the duties of the vacant office in an acting capacity. 5 U.S.C. § 3346(a). First, a 210-day period, after which, if a permanent replacement has not been nominated, the office becomes vacant. 5 U.S.C. § 3346(a)(1). Second, an open-ended period of acting service when the Senate is considering the President's nominee for the office, 5 U.S.C. § 3346(a)(2). Plaintiff claims that because Nancy Berryhill's 210-day period of acting service pursuant to § 3346(a)(1) expired on November 17, 2017, she could not—as she purported to do—legitimately serve as Acting Commissioner pursuant to § 3346(a)(2) after November 17, 2017. (Pl.'s Mem.

23

Supp. Summ. J. 30.) On July 16, 2018, Nancy Berryhill ratified the appointment of the ALJ who presided over this case, so if Plaintiff is correct about the FVRA, the ALJ was not properly appointed. (*Id.* at 35.)  The Commissioner responds that Acting Commissioner Berryhill could serve under the FVRA because the Senate was considering a nominee for the office of Commissioner at the time, and the FVRA does not bar an Acting Commissioner from serving, at different times, pursuant to both § 3346(a)(1)  and § 3346(a)(2) (Def.'s Mem. Supp. Summ. J. 8–9.)

The issue is one of statutory interpretation: whether the Acting Commissioner whose temporary term under the FVRA expires can resume her duties as Acting Commissioner as soon as the President submits a nominee for the Senate's consideration.[17] *Richard J.M. v. Kijakazi*, No. 19-CV-827 (KMM), 2022 WL 959914, at *3 (D. Minn. Mar. 30, 2022). District Courts in the District of Minnesota and the Northern District of Iowa have considered Ms. Berryhill's ratification of the appointment of SSA ALJs at great length and come to differing conclusions. *Compare Stephanie G. v. Kijakazi*, No. 21-CV-1290 (WMW/BRT), 2022 WL 4112413, at *6 (finding Berryhill's appointments after her  post-inauguration period of service as Acting Commissioner expired were invalid) (D. Minn. June 21, 2022), *R&R adopted* 2022 WL 3572936 (D. Minn. June 21, 2022) *and Richard J.M.*, 2022 WL 959914, at *10 (same) *and Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615,

---

[17] This is sometimes referred to as "springing back" and the question before the Court is sometimes phrased as whether the FVRA has a "spring-back" provision. *See, e.g.*, *Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615, 627 (D. Minn. 2022); *see also* Guidance on Application of Federal Vacancies Reform Act of 1998, 23 Op. O.L.C. 60, 68 (1999) ("The Vacancies Reform Act incorporates a spring-back provision . . . .").

635–36 (D. Minn. 2022) (same, in the first searching analysis of this issue), *with Toni M. v. Kijakazi*, No. 22-CV-2007 (LRR), 2022 WL 17177310, at *12–19 (N.D. Iowa Nov. 23, 2022) (coming to the opposite conclusion); *Alan S. v. Kijakazi*, No. 21-CV-103 (LRR), 2022 WL 4464847, at *18, (N.D. Iowa Sept. 26, 2022) ("This district has rejected the interpretation set forth in *Brian T. D.*"); *Sidney M. v. Kijakazi*, No. 21-CV-2034 (LTS), 2022 WL 4482859, at *21 (N.D. Iowa Sept. 26, 2022) (also departing from *Brian T. D.*); *Arden B. v. Kijakazi*, No. 21-CV-2008 (KEM), 2022 WL 2918917, at *9–18 (N.D. Iowa July 25, 2022) (same, and further finding that this interpretation did not render the FVRA unconstitutional under the Appointments Clause). District courts outside the Eighth Circuit have also weighed in on the split. *See, e.g., Victoria G. H. v. Kijakazi*, No. 22-CV-1556 (FLW), 2022 WL 17751355, at *16 (D.N.J. Dec. 19, 2022) (finding Berryhill's ratification of the ALJ appointments valid); *Richard B. v. Kijakazi*, No. 21-CV-609 (LPA), 2022 WL 2834345, at *23 (D.N.C. July 20, 2022). The issue is now pending before the Eighth Circuit Court of Appeals. *Brian D. v. Kijakazi*, No. 22-1601 (argued Dec. 14, 2022).

Plaintiff submits that the Court can avoid the FVRA issue by remanding this case on the merits, which Plaintiff claims would make it unnecessary to opine on this question of statutory interpretation. (Pl.'s Mem. Supp. Summ. J. 25–26.) The Court appreciates Plaintiff's solicitude for judicial economy, but respectfully disagrees. When this Court recommends remand, it must clarify whether the SSA may assign the case to the same ALJ on remand, or if it must assign the case to an ALJ whose authority is not in question. If the Court did not make this clear to the SSA, it would risk having the case return to an ALJ

whose authority the Court has not evaluated, despite an active dispute on that point between the parties, more broadly within the Eighth Circuit, and even nationwide.[18]

After carefully considering not only the briefs of the parties and the authorities they cite, but also the comprehensive opinions of other courts which have considered the question, the Court concludes that Ms. Berryhill was legally serving as Acting Commissioner on the date she ratified ALJ Berry's appointment. Therefore, the ALJ in this case was properly appointed and had legal authority to hear and adjudicate this case.

### i. *The Appointments Clause and the Federal Vacancies Reform Act of 1998*

The Constitution vests in the President the power to appoint "Officers of the United States" with the "Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2;[19] *see United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021) (recounting the history and purpose of the Appointments Clause). When a presidentially appointed and senate confirmed office—what courts call a "PAS office"—becomes vacant, the President may direct an employee to perform the functions of the vacant office in an acting capacity. *N.L.R.B. v. Sw. Gen., Inc.*, 580 U.S. 288, 292–93, 95 (2017) (reviewing Congress's various

---

[18] Because the Court orders remand on the merits and finds that the ALJ in this case was properly appointed, the Court need not address whether its interpretation of the FVRA violates the Appointments Clause. (Pl.'s Mem. Supp. Summ. J. 38–39.) In any event, the Commissioner correctly notes that this issue of law was not fully briefed and is therefore not before the Court. (Def.'s Mem. Supp. Summ. J. 16 n. 8).

[19] "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2

authorizations for the President to appoint acting officers for PAS offices). Acting officers are required because the "process for making PAS appointments is not always a smooth one and can result in vacant PAS offices . . . . 'The President may not promptly settle on a nominee to fill an office; the Senate may be unable, or unwilling, to speedily confirm the nominee once submitted. Yet neither may desire to see the duties of the vacant office go unperformed in the interim.'" *Richard J.M. v. Kijakazi*, 2022 WL 959914 at *2 (quoting *Sw. General*, 580 U.S. 288, at 294). Therefore, since at least 1792, Congress has provided a statutory framework by which the President can temporarily fill PAS offices with acting officials. *Id.*

The Federal Vacancies Reform Act of 1998 (FVRA) outlines who may serve in an acting capacity, and for how long. *Sw. General,* 580 U.S. at 295–97 (citing 5 U.S.C. §§ 3345(a) and 3346(a)–(b)(1)); Cong. Rsch. Serv., R44997, *The Vacancies Act: A Legal Overview* 10 (2022). By operation of 5 U.S.C. § 3345, when a PAS office becomes vacant, the "first assistant" assumes the duties of the office, but § 3345 also provides that the President can override that default option and direct a person other than the first assistant to perform the functions of the vacant office, so long as the person so directed is either (1) already serving the agency in a PAS role or (2) is an employee of the agency who served at least 90 of the 365 days before the vacancy in a senior role at the agency. 5 U.S.C. § 3345; *Sw. Gen., Inc.*, 580 U.S. at 295–96. A person serving under § 3345 can serve for only a limited time, as described in § 3346:

> (a) Except in the case of a vacancy caused by sickness, the person serving as
> an acting officer as described under section 3345 may serve in the office—

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—

(A) until the second nomination is confirmed; or

(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346. When a vacancy occurs in proximity to the inauguration of a President, the 210-day period of allowable acting service begins 90 days after the presidential inauguration or the day the vacancy occurs, whichever is later. 5 U.S.C. § 3349a(b). In effect, the allowable period under 5 U.S.C. § 3346(a)(1) becomes 300 days if a vacancy occurs close in time to a Presidential inauguration.

The statute provides two limits on when an acting officer can serve in a vacancy: (1) the 210-day period (plus, if the vacancy occurs in conjunction with a change of presidential administration, the 90-day grace period) or (2) "once a first or second nomination for the office is submitted to the Senate." 5 U.S.C. § 3346(a). If an acting officer is not serving in the vacancy pursuant to 5 U.S.C. §§ 3345, 3346, and 3347, "the office shall remain vacant" and the actions of anyone serving in violation of those sections "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(b), (d).

The Commissioner of Social Security is a PAS office, 42 U.S.C. § 902(a)(1), and thus, the FVRA applies to vacancies in the SSA.[20] Again, the issue is whether Ms. Berryhill, whose 300-day term (the usual 210-day term, plus 90 days because the vacancy she filled on an acting basis occurred sufficiently close in time to a Presidential inauguration) under the FVRA had already expired could resume her duties as Acting Commissioner as soon as the President submitted a nominee for the Senate's consideration. Plaintiff submits the answer must be no, while the Commissioner asserts that the answer must be yes. To explain the answer, a brief detour into the recent history of the SSA is required.

### ii. The SSA in the 2017 Presidential Transition

Near the end of his administration, President Obama signed a memorandum outlining the order of succession for the office of Commissioner of Social Security. Memorandum for the Commissioner of the Social Security Administration, 81 Fed. Reg. 96337 (Dec. 23, 2016), 2016 WL 487744. The day after President Trump's inauguration, then-Acting Commissioner Carolyn Colvin resigned, leaving vacancies in both the offices of the Acting Commissioner and Deputy Commissioner,[21] and Nancy Berryhill, then the

---

[20] FVRA is not the only statute that controls how vacancies are filled in the SSA. *Brian T. D.,* 580 F. Supp. 3d at 626. The FVRA's exclusivity provision does not apply when an agency-specific statute—in this case the Social Security Act—authorizes the President to designate a person to serve in an acting capacity, or when the statute designates a specific officer or employee to serve in an acting capacity. *Id.*; 5 U.S.C. § 3347(a)(1). Neither party is arguing that Acting Commissioner Berryhill was designated under the Social Security Act.

[21] Acting Commissioner Colvin had been Deputy Commissioner before becoming Acting Commissioner, and her old role had not been filled at the time she resigned as Acting

SSA's Deputy Commissioner for Operations, assumed the office of acting commissioner by operation of President Obama's Memorandum. *Alan S.*, No. 21-CV-103 (LRR), 2022 WL 4464847, at *17 n.4, n.5 (N.D. Iowa Sept. 26, 2022). On March 6, 2018—over 400 days after Acting Commissioner Colvin's resignation—the General Counsel of the Government Accountability Office, a non-partisan agency tasked with assuring that the executive branch is operating in compliance with the law, notified President Trump that Ms. Berryhill's term as acting commissioner of the SSA pursuant to the FVRA had expired on November 17, 2017. U.S. Gov't Accountability Off., B-329853, Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988—Commissioner, Social Security Administration 2 (2018), https://www.gao.gov/products/b-329853. Ms. Berryhill then stepped down as acting commissioner and returned to her previous position as Deputy Commissioner for Operations while also performing the "delegable functions"[22] of the Commissioner's office. *Richard J.M.*, 2022 WL 959914 at *4. President Trump nominated Andrew Saul to be the SSA Commissioner on April 17, 2018. Mr. Saul had a lengthy confirmation process and did not take office as Commissioner until June 17, 2019. *Brian T. D.*, 580 F. Supp. 3d at 621, 621 n.3.  Importantly for this case, Mr. Saul's nomination was still pending before the Senate in summer 2018.

---

Commissioner. *Arden B.*, No. 21-CV-2008 (KEM) (N.D. Iowa, July 25, 2022), 2022 WL 2918917 at *2.

[22] Under the Social Security Act as it was then written, "[t]he Commissioner may assign duties, and delegate, or authorize successive redelegations of, authority to act and to render decisions to such officers and employees of the [Social Security] Administration as the Commissioner may find necessary." 42 U.S.C. § 902(a)(7) (2018).

Upon Mr. Saul's nomination, Ms. Berryhill purported to resume her role as acting commissioner. *Alan S.*, No. 21-CV-103 (LRR), 2022 WL 4464847 at *18 n.9 (N.D. Iowa Sept. 26, 2022). Shortly after Mr. Saul's nomination reached the Senate, the Supreme Court issued its decision in *Lucia v. S.E.C.*, holding that the Securities and Exchange Commission's ALJs were "inferior officers" under the Appointments Clause and therefore had to be appointed by the "President, a court of law, or a head of department." 138 S. Ct. 2044, 2049, 2051 (2018). Because the ALJs whose appointments were at issue in *Lucia* were hired by staff at the S.E.C. and not by the Chair of the S.E.C., the Supreme Court remanded the case to a properly appointed ALJ, "or the Commission itself." 138 S. Ct. at 2055. The SSA, which also used staff to hire its ALJs, was concerned that the new decision would apply to the SSA as well. SSR 19-1p, 84 Fed. Reg. 9582, 9583, 2019 WL 1324866 (Mar. 15, 2019). Acting Commissioner Berryhill responded to the *Lucia* decision on July 16, 2019, by ratifying the appointments of the SSA's ALJs. *Id.* ("To address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the Department of Justice, on July 16, 2018 the Acting Commissioner of Social Security ratified the appointments of [the Agency's] ALJs and approved those appointments as her own.")

One of the appointments Acting Commissioner Berryhill ratified was that of Hallie Larsen, the ALJ who heard Plaintiff's case. (Def.'s Mem. Supp. Summ. J. 26). Plaintiff argues that this ratification was invalid—and thus the ALJ in his case was unconstitutionally appointed—because Ms. Berryhill's service as Acting Commissioner ended when the Government Accountability Office's report said it did, on November 17,

2017 (when the 300-day period ended). (Pl.'s Mem. Supp. Summ. J. 34–35.) The Commissioner argues that Ms. Berryhill was properly serving as Acting Commissioner when she signed the ratification, because Andrew Saul's pending nomination in the Senate allowed her to resume service under § 3346(a)(2). (Def.'s Mem. Supp. Summ. J. 7.)[23] This Court agrees with the Commissioner, joining the majority of courts to consider the issue and respectfully disagreeing with other decisions to the contrary in the District of Minnesota. *Accord Arden B.*, 2022 WL 2918917 at *4; *Ann R. v. Kijakazi*, No. 21-CV-29, 2022 WL 16798792, at *1 n.1 (D. Nev. Nov. 8, 2022); *Victoria G. H.*, 2022 WL 17751355, at *11 n.5 (D.N.J. Dec. 19, 2022).

### iii. The Plain Text of the Statute Indicates Acting Commissioner Berryhill Was Lawfully Filling the Commissioner's Office on an Acting Basis When She Ratified ALJ Larson's Appointment.

Statutory interpretation must begin with the language of the statute itself. *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019). Courts understand words in a statute to have their "ordinary, contemporary, common meaning," and read the words in context, not in isolation. *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 20, 27 (2014)). If a statute is "susceptible to more than one reasonable interpretation," it is ambiguous. *LaCurtis v. Express Med. Transps. Inc.*, 856 F.3d 571, 578 (2017) (quoting *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862 (8th Cir. 2011)). Courts may turn to legislative history for guidance

---

[23] The Court in *Brian T. D.* helpfully summarized the competing theories in a timeline. 580 F. Supp. 3d at 625.

as to Congress's intent when the text it enacted is ambiguous. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020).

The text of the FVRA explains that "the person serving as an acting officer as described in § 3345 may serve" for "no longer" than the initial 210-day period, "or . . . once a first or second nomination for the office is submitted to the Senate." 5 U.S.C. § 3346(a).[24] Two words in particular are the subject of dispute: "serving" and "or." *See Sidney M. v. Kijakazi*, 2022 WL 4482859, at *15.

### 1. The Word "or" in the FVRA Is Inclusive, Meaning an Acting Officer Can Constitutionally Serve First During an Initial Term and Then Serve Again While the Senate Considers the President's Nomination.

The "or" in the FVRA is an inclusive disjunction. *See Arden B.*, 2022 WL 2918917 at *7. It provides that a person authorized to serve under § 3345 can serve both during the initial 210-day term and while a nomination is pending before the Senate. *Id.* ("Congress did not qualify the use of "or" with "either," which tends to indicate that the alternatives are mutually exclusive.") *Alan S.*, 2022 WL 4464847 at * 22 (disagreeing with the *Brian T. D.* court's reliance on *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994), which did not address whether "or" was inclusive or exclusive). When a nomination is submitted to the Senate, a person with the credentials described in § 3345 can automatically take on the office of Commissioner in an acting capacity and is not prevented from doing so by having served as Acting Commissioner during an initial 210-day term. Here, Ms. Berryhill

---

[24] Congress then laid out the specific limits of service when a nomination is pending in § 3346(b).

served her initial term, which ended on November 17, 2018. When Andrew Saul's nomination arrived at the Senate, Ms. Berryhill was back in her role as the Deputy Commissioner of Operations, the position next in line to that of the Commissioner under President Obama's memorandum, because the Deputy Commissioner of Social Security position was also vacant. U.S. Gov't Accountability Off., B-329853, at 1 n.2.  Thus, once Mr. Saul's nomination arrived in the Senate, Ms. Berryhill was again the Acting Commissioner by virtue of the presidential memorandum. 5 U.S.C. § 3345(a)(2) ("the person serving as an acting officer as described under section 3345 may serve in the office . . . once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate."); *Karen E.*, No. 21-CV-3015 (CJW), 2022 WL 17548644 at *16 (N.D. Iowa Aug. 2, 2022), *R&R adopted in relevant part* 2022 WL 17548642 (Sept. 15, 2022).

## 2. "The Person Serving" Refers to Those Eligible to Serve Under § 3345, Not Only Those Currently Serving.

Section 3346(a) governs "the person serving as an acting officer as described under section 3345." Plaintiff takes this to mean that § 3346(a)(1) and (a)(2) can only apply to the person *currently* serving in the office. (Pl.'s Mem. Supp. Summ. J. 31) On Plaintiff's view, once the initial period under § 3346(a)(1) has passed and the office is vacated, no one is *currently* serving, and the office must remain vacant. (*Id.* at 32.) *See Brian T. D.*, 580 F. Supp. 3d. at 631. Most courts have rejected this reading as adding text to the statute that Congress did not put there. *See, e.g., Alan S.*, 2022 WL 4464847 at *19; *Victoria G. H.*, 2022 WL 17751355 at *12. The words "currently" or "presently" do not appear in the

statutory text. *Victoria G. H.*, 2022 WL 17751355 at *12. The words "may serve" do. *Arden B.,* 2022 WL 2918917 at *5 ("Significantly, the active verb in § 3346(a) is not serving, but 'may serve': 'the person . . . may serve' subject to the time limits set out in subsections (a)(1) and (a)(2).") The best reading, in the Court's view, is that Congress used the present participle "serving" to refer to those who are *eligible to serve* under § 3345 of the FVRA. As one Court succinctly put it:

> The Court disagrees that the language of 5 U.S.C. § 3346 states an individual must already be serving as acting officer on the date that a nomination is made in order to *continue* to properly serve in that role. . . . The court finds that the text present in 5 U.S.C. § 3346 cross-references to 5 U.S.C. § 3345 and that it is 5 U.S.C. § 3345 of the FVRA that provides for what individual "may serve." Thus, the language at 5 U.S.C. § 3346 is in the present tense, not because it serves as a limitation, but because it relates to the individual next designated to serve pursuant to the applicable section, Section 3345 of the FVRA.

*Alan S.,* 2022 WL 4464847 at *19.

Interpreting "serving" as referring to those eligible to serve under § 3345 also avoids inconsistencies with the rest of the FVRA. Because "serving" is in the prefatory language of subsection (a), it applies equally to subsections (a)(1) and (a)(2). *Arden B.,* 2022 WL 2918917 at *5. If "serving" means—as Plaintiff argues—that the person satisfying subsection (a)(2) must be *currently* serving when the President submits a nominee to the Senate, it must also mean that the person satisfying subsection (a)(1) must be *currently* serving when a vacancy is created. *Id.* The only person who can immediately serve when a vacancy is created is the "acting officer" under § 3345(a), because the duties of the PAS office pass to them by default. But interpreting § 3346 (a)(1) to mean that only the "acting officer" can serve would render the President's power to override the default order of

succession—provided for in § 3345(a)(2) and (3)—a nullity. As the Commissioner argues, if the President were "to designate an acting official after the first assistant had assumed office by default, the alternative official would not be the person *presently* 'serving as an acting officer as described under section 3345,' and thus could not "serve *at all* because § 3346(a)'s prefatory phrase applies to service under both § 3346(a)(1) and (a)(2)." (Def.'s Mem. Supp. Summ. J. 13–14). This reading would contradict the text of the FVRA, which provided a default successor in the "first assistant" role, then proceeded to grant the President the power to deviate from this default, and then articulated limits to how far the President could deviate from the default. *See* 5 U.S.C. § 3545(a)(1)–(3). Interpreting "serving" as referring to those eligible to serve under § 3345, as opposed to those "currently serving" at the time of a vacancy or a Senate nomination, avoids this problem altogether.

The fact that subsections (b)(1) and (b)(2) use the language "continue to serve" does not change the Court's analysis. The FVRA provides that if a nomination is rejected, withdrawn, or returned, the person serving "may continue to serve as the acting officer" for a period of time. It makes sense that Congress, having written the subsection that allowed a person to serve during the pendency of a nomination in subdivision (a)(2), would say that such a person could "continue" their service after such a nomination failed. *Arden B.,* 2022 WL 2918917 at *5. That word choice does not support the idea that a person "serving" under subsection (a) must be "currently serving." *Id.*

The Court finds that the statute is clear and that therefore nothing outside the statute's plain language is required to interpret it. Nevertheless, the Court acknowledges that other Courts have also described the statute as clear, then come to the opposite

36

conclusion. If this diversity of judicial opinion means the statute is ambiguous, and that therefore extra-textual sources may be consulted in order to clarify the statute's meaning, then the Court notes that the legislative history of the FVRA speaks to the very issue before this Court and does so with clarity.

### iv.  The Legislative History Confirms the Plain Text Reading.

The committee report on S. 2176—what later became the FVRA—described the purpose of the bill as "creating a clear and exclusive process to govern the performance of duties of offices in the Executive Branch that are filled through presidential appointment by and with the consent of the Senate . . . ." S. Rep. 105-250, at 1 (1998).  The report observed that, should a president run afoul of the new law and not submit a nomination to the Senate within the approved time, the bill would require that the office remain vacant. *Id.* at 2, 16. However, it provided that "[t]he sanction can be ended if the President submits a nominee after the 150-day[25] period, whereupon the acting officer can resume service." *Id.* In fact, Congress even contemplated the very situation about which the parties argue:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve more than 150days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. The acting officer may serve even if the nomination is submitted after the 150 days has passed although, as discussed below, the acting officer may not serve between the 151st day and the day the nomination is submitted. The Committee extends the time period for acting service so as to create an incentive for the President to submit a nomination. The submission of nominations also will lead to a reduction in the number of acting officials, a goal the Committee finds highly desirable.

---

[25] At the time the committee report was written, the time limit was 150 days, not 210 as it eventually became.

*Id.* at 14–15. While it is true that the bill's text did change from the time the committee report was written, those changes do not change the persuasiveness of the report. *See Arden B.,* 2022 WL 2918917 at *8. For instance, the *Brian T. D.* court noted that the text of what would become § 3348(b) changed from the time of the report to the time of enactment. *Id.* At the time of the committee report it read "if the President does not submit a first nomination to the Senate to fill a vacant office within" the allotted time "the office shall remain vacant until the President submits a first nomination to the Senate." *Id.* But the final bill read, "[u]nless an officer or employee is performing the functions and duties in accordance with sections 3345, 3346, and 3347" if a PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office . . . the office shall remain vacant." *Id.* As the Court in *Arden B.* explained, the Congressional Record shows that the reason for this change was to ensure that the vacant office provision applied automatically unless some officer or employee took on the responsibilities of the office. *Id.* (citing 144 Cong. Rec. 27,497 (1998)). Thus, the committee's statement above is just as applicable now as it was when it was written.

## IV.   Recommendation

The Court acknowledges that it has been well over four years since Plaintiff suffered his stroke and applied for DIB and SSI. This recommendation for remand, if adopted, will necessarily lengthen Plaintiff's period of waiting, but it will also require the SSA to explain why a one- to two-step limitation was not included in Plaintiff's RFC. This explanation is necessary to resolve the case regardless of how the Eighth Circuit ultimately determines how best to interpret the FVRA.

Accordingly, based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.   Plaintiff's Motion for Summary Judgment (Dkt. No. 14) be **GRANTED IN PART AND DENIED IN PART**;

2.   Defendant's Motion for Summary Judgment (Dkt. No. 16) be **DENIED**;

3.   The Commissioner's decision be **REMANDED** to the SAA; and

4.   **JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: January 29, 2023                              *s/ John F. Docherty*
                                                    JOHN F. DOCHERTY
                                                    United States Magistrate Judge